```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION

 3     ............................................
                                     :
 4     UNITED STATES OF AMERICA,     :
                                     :        Case Number:
 5          Plaintiff,               :        6:25-mj-02115-NWH-1
                                     :
 6     v.                            :        Orlando, Florida
                                     :        October 9, 2025
 7                                   :        9:56 AM - 11:25 AM
       JONATHAN RINDERKNECHT,        :
 8                                   :
            Defendant.               :
 9                                   :
       ............................................

10

11             TRANSCRIPT OF DETENTION HEARING
           BEFORE THE HONORABLE NATHAN W. HILL
12             UNITED STATES MAGISTRATE JUDGE

13     APPEARANCES:

14     For the Plaintiff:          Rachel S. Lyons, Esquire
                                   Chauncey A. Bratt, Esquire
15                                 U.S. ATTORNEY'S OFFICE
                                   400 West Washington Street
16                                 Suite 3100
                                   Orlando, Florida 32801
17
       For the Defendant:          Aziza Hawthorne, Esquire
18                                 Joshua R. Lukman, Esquire
                                   FEDERAL PUBLIC DEFENDER'S OFFICE
19                                 201 South Orange Avenue
                                   Suite 300
20                                 Orlando, Florida 32801

21


22     Proceedings recorded by real-time mechanical stenography.
       Transcript produced by computer-aided transcription.
23
                       Stenographically reported before:
24         Heather Suarez, RDR, CRR, FCRR, FPR-C, CA CSR
                (407) 801-8921 | heather@stenosuarez.com
25         StenoSuarez, LLC; PO Box 3574; Orlando, Florida 32802
```

|   |   |
|---|---|
| 1 | **T A B L E   O F   C O N T E N T S** |
| 2 | **October 9, 2025** |
| 3 | PAGE |

WAIVER OF IDENTITY HEARING .................................4

WITNESS CALLED BY GOVERNMENT:

    THOMAS HARRISON
    Direct Examination By Ms. Lyons .......................5
    Cross-Examination By Ms. Hawthorne ..................18
    Jencks Material Requested ...........................22
    Redirect Examination By Ms. Lyons ..................23

PROFFER BY MS. LYONS ......................................27

ARGUMENT BY MS. LYONS .....................................32

PROFFER BY MS. HAWTHORNE ..................................39

ARGUMENT BY MS. HAWTHORNE .................................43

REBUTTAL ARGUMENT BY MS. LYONS ...........................47

SURREBUTTAL ARGUMENT BY MS. HAWTHORNE ....................49

RULING ...................................................50

CERTIFICATE OF REPORTER ..................................57

**E X H I B I T S**

| GOVERNMENT | | PAGE ADMITTED |
|---|---|---|
| Number 1 | 09/19/2025 CAD Incident Report | 18 |
| Number 2 | 09/25/2025 CAD Incident Report | 18 |

| DEFENDANT | | PAGE ADMITTED |
|---|---|---|
| Number 1 | 2021-2022 Pretrial Services Violations Summary Report | 42 |

1          P R O C E E D I N G S

2          (Proceedings commenced at 9:56 AM.)

3          **THE COURTROOM DEPUTY:**  Case Number 6:25-mj-2115,

4    United States of America v. Jonathan Rinderknecht.

5          Counsel, please state your appearances for the

6    record.

7          **MS. LYONS:**  Good morning, Your Honor.  Rachel Lyons

8    and Chauncey Bratt for the United States.  Here with us at

9    counsel table is Special Agent Thomas Harrison from the Bureau

10   of Alcohol, Tobacco, Firearms, and Explosives.

11         **AGENT HARRISON:**  Good morning.

12         **THE COURT:**  Good morning.

13         **MS. HAWTHORNE:**  Good morning, Your Honor.

14   Aziza Hawthorne with the federal defender office representing

15   Mr. Rinderknecht, who is seated to my left.  Also with me is

16   Joshua Lukman from the federal defender office.

17         **THE COURT:**  Good morning.

18         We're here today for a continuation of two hearings

19   from the initial appearance in this matter yesterday.  I

20   believe we continued both the identity hearing and the

21   detention hearing.  The parties -- or the United States filed

22   an unopposed motion last night seeking to move the preliminary

23   hearing through October 17th, which I granted.  So here

24   we're -- we're here today really on just the identity hearing

25   and detention.

4

1    So let's deal with identity first, I suppose.

2    Ms. Hawthorne, how do you want to proceed as to identity?

3    All right.  I see my courtroom deputy just handed me

4    a waiver.  So is it your client's intent to waive the identity

5    hearing?

6        **MS. HAWTHORNE:**  Yes, Your Honor.

7        **THE COURT:**  All right.  I'll accept that waiver, and

8    then we can move on to detention.

9    Is the United States prepared to proceed?

10       **MS. LYONS:**  Yes, Your Honor.

11       **THE COURT:**  And, Ms. Hawthorne, are you prepared to

12   proceed?

13       **MS. HAWTHORNE:**  Yes.

14       **THE COURT:**  All right.  Ms. Lyons, whenever you're

15   ready.

16       **MS. LYONS:**  Okay, Your Honor.  The United States

17   intends to call one witness.  I have two exhibits, and then the

18   witness will testify as to recent events, and then I will

19   proffer some facts about the charged offense itself.

20       **THE COURT:**  Okay.  Well, you want to proceed with the

21   evidence portion first and then you can do argument after.

22       **MS. LYONS:**  Yes, Your Honor.  Thank you.

23   The United States calls Special Agent Thomas

24   Harrison.

25       **THE COURTROOM DEPUTY:**  Step over here.  Raise your

1    right hand to be sworn.

2            Do you solemnly swear or affirm the testimony you are

3    about to give shall be the truth, the whole truth, and nothing

4    but the truth?

5            **THE WITNESS:**  I do.

6        (Thomas Harrison sworn.)

7            **THE COURTROOM DEPUTY:**  You may be seated.

8            **THE WITNESS:**  Thank you.

9            **THE COURTROOM DEPUTY:**  Please state your name for the

10   record.

11           **THE WITNESS:**  My name is Thomas Harrison.  That is

12   T-h-o-m-a-s.  Harrison is H-a-r-r-i-s-o-n.

13           **THE COURTROOM DEPUTY:**  Thank you.

14           **THE COURT:**  You may proceed when you're ready.

15           **MS. LYONS:**  Thank you, Your Honor.

16                          DIRECT EXAMINATION

17   **BY MS. LYONS:**

18   **Q.**  Good morning.

19   **A.**  Good morning.

20   **Q.**  Where do you work?

21   **A.**  I work for the Bureau of Alcohol, Tobacco, Firearms, and

22   Explosives out of the Orlando field office.

23   **Q.**  And what is your position?

24   **A.**  I'm a special agent.

25   **Q.**  Will you describe some of your job duties.

1    A.    Yes.  We generally investigate alleged crimes of federal

2    offenses pertaining to firearms, arson, and explosives.

3    Q.    And how long have you worked there?

4    A.    A little over five years.

5    Q.    And what were you doing before that?

6    A.    I was a police officer in the City of Gainesville,

7    Florida.

8    Q.    And how much time total do you have in law enforcement?

9    A.    I'm on my 21st year.

10   Q.    Now, were you involved in the investigation of the

11   defendant in this case?

12   A.    I was.

13   Q.    Fair to say, since you're local to the Middle District of

14   Florida, you're not the lead case agent?

15   A.    Correct.  My involvement was relatively limited.

16   Q.    And what was your role within the investigation?

17   A.    I was made aware of the case a few weeks ago.  I was told

18   that the defendant in this case had an arrest warrant that was

19   issued out of the District of California, and I was tasked with

20   organizing the arrest of the defendant.

21   Q.    Now, have you ever met him in person?

22   A.    I have not.

23   Q.    Were you present for his arrest?

24   A.    I was.

25   Q.    I want to talk more about the circumstances of his arrest

1    in just a little bit, but I have a couple of questions first.

2        Do you know where he was staying here in Florida?

3    A.   I do.

4    Q.   And generally, where was that?  What were the -- what were

5    his living arrangements?

6    A.   It was in a -- his sister and brother-in-law's residence

7    located in West Melbourne, Florida.

8    Q.   And who else lives in that home?

9    A.   He resided there with his biological sister; her husband,

10   so his brother-in-law; as well as their two small children,

11   which I believe are age two and five.

12   Q.   And is this a house? an apartment?

13   A.   This is a single-family residence.

14   Q.   And when did he move there, to your knowledge?

15   A.   Approximately five months ago.

16   Q.   And where did he live prior to that?

17   A.   He was in the state of California.

18   Q.   Do you know whether he has any additional family locally?

19   A.   I do.  To my understanding, I believe he has family in

20   Viera, Florida, as well as another sister that resides in the

21   Orlando area.

22   Q.   What do you know about his employment history?

23   A.   To my understanding and based on the investigation, I

24   believe that Mr. Rinderknecht had worked for Uber or Uber Eats.

25   I believe he was either terminated or left that employment

1    sometime recently within the past few days or weeks.

2    Q.    And does he have any significant assets?

3    A.    Not that I'm aware of.

4    Q.    Does he have any ties to a foreign country?

5    A.    He does.

6    Q.    And what are those ties?

7    A.    So he had spent a good portion of his life in the country

8    of France.  His father currently resides there as well as his

9    brother.

10   Q.    Now, since he has been living with his sister and her

11   family, have there been any interactions with law enforcement?

12   A.    There have.

13   Q.    Is that one occasion?  More than one occasion?

14   A.    There were two specific occasions that have occurred.

15   Q.    And when was the first occasion?

16   A.    The first event took place on September 19th of 2025.

17   Q.    And what is your understanding of what happened on

18   September 19th?

19   A.    On September 19, 2025, there was a call placed to the

20   West Melbourne Police Department indicating that there was a

21   disturbance at the residence where Mr. Rinderknecht resides.

22   The caller was Mr. Rinderknecht's brother-in-law.  He stated

23   that there was a heated exchange and argument between

24   Mr. Rinderknecht and his sister and brother-in-law.

25   Q.    And during that incident, did the defendant make any

1    specific threats?

2    **A.**    Well, at the time when -- when police arrived and they

3    interviewed both parties, Mr. Rinderknecht's brother-in-law had

4    stated that there was some escalating issues and tension that

5    had been growing between the family and that previous to this

6    incident Mr. Rinderknecht had made a statement to them stating

7    that he would, quote, "burn the house down."

8    **Q.**    And you've gotten into this a little bit already, but what

9    happened once that call was received?

10   **A.**    Police responded.  They interviewed both

11   Mr. Rinderknecht's brother-in-law and sister as well as

12   Mr. Rinderknecht himself.  The argument ensued because

13   Mr. Rinderknecht was informed by his sister that she had a

14   serious medical condition that she had recently been diagnosed

15   with.  Mr. Rinderknecht provided his advice, rather

16   unsolicited, in regard to lifestyle and dietary changes.

17       Being as -- that there were actually four children under

18   the age of ten that were present at the home at the time of

19   this, Mr. Rinderknecht's sister asked him to refrain and not

20   discuss the issue.  Mr. Rinderknecht continued, and at the

21   eventual point, Mr. Rinderknecht had stated, in the presence of

22   the five-year-old son, that his mother had this condition and

23   that she would die as a result of it.

24   **Q.**    Fair to say that this behavior by the defendant was

25   upsetting to the family?

1    **A.**    Yes.

2    **Q.**    And how did this particular incident resolve itself?

3    **A.**    The officers on scene determined that there was no crime

4    that was committed.  There was a discussion in regard to asking

5    Mr. Rinderknecht to leave, as in finding a new place to reside.

6    The officers on scene provided information to both

7    Mr. Rinderknecht's sister and brother-in-law in regard to how

8    to proceed forward with a civil eviction process, and then

9    Mr. Rinderknecht was advised by the officers on scene that

10   maybe it was a good opportunity to drive in your car for a

11   period of time, get away from the house, and separate.

12   **Q.**    And what was the second incident that occurred?

13   **A.**    The second incident occurred on September 25, 2025, at, I

14   believe, about 2:00 PM at the same residence.  This call was

15   reported by both Mr. Rinderknecht's father, who was in country

16   at the time, as well as Mr. Rinderknecht's brother-in-law.  It

17   was reported initially as an armed disturbance.

18   **Q.**    And what is your understanding of the specifics of the

19   call that was placed?

20   **A.**    Based on the computer-aided dispatch log and the body-worn

21   camera footage that I was able to review, the call that was

22   placed by Mr. Rinderknecht's father -- he stated to police that

23   Mr. Rinderknecht was in possession of a firearm and that

24   Mr. Rinderknecht's father was concerned about his declining

25   mental state and his possession of said firearm.

1    **Q.**   And what happened after that report was made?

2    **A.**   Officers responded to the scene.  They made contact with

3    both Mr. Rinderknecht's father initially and then

4    Mr. Rinderknecht himself.

5    **Q.**   And did they receive additional information once they

6    arrived?

7    **A.**   They did.  Mr. Rinderknecht's father was -- had flown in

8    from France.  This was at the request of Mr. Rinderknecht's

9    sister, namely in regard to the tensions that were raising,

10   hoping that Mr. Rinderknecht's father might be able to mitigate

11   or help sort things out.

12        When he arrived there -- I should say the night previous

13   to this call, in conversation Mr. Rinderknecht indicated to his

14   father that he was in possession of a firearm.  The following

15   morning, which would be the morning of the incident,

16   Mr. Rinderknecht had left the residence for a period of time.

17   He has a camera that is set up in his room, and he saw that his

18   father had gone into his room.  When Mr. Rinderknecht returned,

19   he confronted his father about this and said, "Yes, I have a

20   firearm," and they begin to -- began to discuss that, at which

21   time he stated, "I have it.  It's unloaded."  He retrieved it,

22   showed it to his father.

23        His father made statements to the officers stating that

24   Mr. Rinderknecht had made a comment the night before, stating

25   that if his brother-in-law got on him that he would use his

1  firearm in self-defense.  Mr. Rinderknecht's father opined that

2  he was concerned about Mr. Rinderknecht's declining mental

3  state and the fact that he was in possession of this firearm

4  and clearly not afraid to utilize it.

5  **Q.**    And the argument over his discovery of his father going

6  into his room -- is that what triggered the phone call?

7  **A.**    Partially.  So it was this follow-up conversation about

8  his possession of a firearm and Mr. Rinderknecht trying to ease

9  the situation, stating that "It's just a firearm.  I've had

10  this for a period of time before I moved in."  And it wasn't

11  until Mr. Rinderknecht's sister overheard the conversation, was

12  made aware of the fact that he had the firearm that the concern

13  was raised and that the phone call was placed to law

14  enforcement.

15  **Q.**    And how did the second incident resolve?

16  **A.**    Once again, officers on scene -- they had run

17  Mr. Rinderknecht's criminal history, to which he has none.  He

18  is in legal possession of a firearm.  He resided at the

19  residence.  He did not brandish it in a threatening manner, and

20  he was legally allowed to stay where he was.  So officers

21  simply advised that Mr. Rinderknecht make sure that the firearm

22  is properly secured, especially considering the fact that there

23  are two children that are residing within the residence.

24       And again, based on the previous interaction on the 19th,

25  the officers reiterated to Mr. Rinderknecht's sister and

1   brother-in-law that they should maybe proceed forward with the

2   civil eviction process.

3   Q.    And what is your understanding of the current living

4   situation?

5   A.    After this event on the 25th involving the firearm,

6   Mr. Rinderknecht's sister and brother-in-law felt unsafe in

7   their home, and they opted to move in with their respective

8   in-laws, which would be Mr. Rinderknecht's brother-in-law's

9   parents, which is in the same area, leaving Mr. Rinderknecht by

10  himself within their home.

11  Q.    And is there any plan or attempts being made to assist him

12  in finding a home by his family members?

13  A.    Yes.  In fact, based on interactions I heard on body

14  camera footage, Mr. Rinderknecht's sister and brother-in-law

15  have offered Mr. Rinderknecht in past -- initially this was

16  supposed to be a temporary living situation for

17  Mr. Rinderknecht.  Because of the escalating tension, they had

18  both told Mr. Rinderknecht that they would be willing to

19  provide moving expenses for him as well as two months' rent to

20  a new lease somewhere as well as an additional $15,000 to help

21  get him on his feet.

22        Mr. Rinderknecht refused this offer, and I -- to my

23  understanding, he had an agreement or wanted them to provide a

24  cosignature to a lease for a place in California.

25  Q.    And are they able to meet his request?

1    **A.**    No.   During the last incident, it was stated by

2    Mr. Rinderknecht's sister and brother-in-law that they were not

3    willing to cosign this lease that he had been requesting.

4    **Q.**    And you've mentioned that they were informed of how to go

5    about an eviction process.   Is that in the works, to your

6    understanding?

7    **A.**    It is.

8    **Q.**    Now, throughout these incidents it sounds like law

9    enforcement had an opportunity to speak with his father, his

10   sister, and his brother-in-law?

11   **A.**    Correct.

12   **Q.**    And did they each express concerns for his mental

13   stability or emotional state?

14   **A.**    Yes.

15   **Q.**    Do you remember specifically any of the concerns that they

16   had?

17   **A.**    Well, namely, as I had indicated previous, during the

18   initial incident, the statement that was made to

19   Mr. Rinderknecht's brother-in-law by Mr. Rinderknecht stating

20   that he would, quote, "burn the house down," the statement made

21   by Mr. Rinderknecht to his father stating that he would defend

22   himself and shoot in self-defense his brother-in-law if needed.

23   That statement was also made by Mr. Rinderknecht to his sister.

24   And again the decline in mental state and erratic behavior as

25   described by all involved.

1    Q.    Now, let's move on to the defendant's arrest.  On what day

2    did that occur?

3    A.    The arrest was made on September 7, 2025.

4    Q.    And can you explain what happened.

5    A.    Yes.  Law enforcement from both ATF as well as the

6    West Melbourne Police Department coordinated an arrest

7    operation wherein a ruse phone call was placed to

8    Mr. Rinderknecht.  He was lured away from his residence, and a

9    traffic stop was effected a short distance away where

10   Mr. Rinderknecht was taken into custody.

11   Q.    And was he taken into custody without incident?

12   A.    Yes.

13   Q.    Did he have any weapons or firearms in his possession?

14   A.    During a search incident to the arrest predicated on the

15   search -- on the arrest warrant, Mr. Rinderknecht was found to

16   be in possession of a magazine loaded with .380 auto

17   ammunition, but no firearm was discovered on his person or

18   within the vehicle.

19            THE COURT:  Ms. Lyons, sorry to interrupt you.

20            You said he was arrested on September 7th.  Did you

21   mean October 7th?

22            THE WITNESS:  I'm sorry.  Yes.  October.

23            MS. LYONS:  Thank you, Your Honor.

24   BY MS. LYONS:

25   Q.    And did you ask him where the firearm that would be

1   associated with the ammunition was?

2   **A.**   Yes.  One of the ATF agents that was involved in the

3   interview of Mr. Rinderknecht after his arrest specifically

4   asked him where the firearm was.  Mr. Rinderknecht indicated at

5   one point that the firearm could be located within the garage

6   and that it was supposedly within a biometric safe.

7   **Q.**   And did law enforcement take steps to locate that firearm?

8   **A.**   We did.

9   **Q.**   And can you explain what happened.

10  **A.**   Yes.  There were three law enforcement officers that met

11  with Mr. Rinderknecht's brother-in-law to provide him with the

12  keys to Mr. Rinderknecht's vehicle as well as to explain the

13  circumstances of the arrest.

14      Law enforcement's fear at the time was that there was an

15  outstanding firearm that was located somewhere within that

16  residence and, again, to our understanding, based on

17  Mr. Rinderknecht's statements, that it was located in the

18  common area of the garage.  Mr. Rinderknecht's brother-in-law

19  provided law enforcement access to the garage and allowed a

20  search to be completed, and there was a -- a firearm --

21  a .380 Smith & Wesson pistol located within a stuffed animal

22  with a zipper compartment on a shelving unit approximately

23  1 foot off the ground.

24  **Q.**   So it was not in a safe as he had said that it was?

25  **A.**   No, it was not.

1    **Q.**   And it was stored inside a child's toy?

2    **A.**   That is correct.

3    **Q.**   Now, have you taken investigative steps to look into this

4    firearm?  Its purchase?  Where it came from?

5    **A.**   Yes, we have.

6    **Q.**   And is that investigation ongoing?

7    **A.**   It is.

8    **Q.**   What have you discovered so far?

9    **A.**   Based on the trace results that came in -- I believe they

10   have come in just today -- this morning -- the firearm is --

11   was purchased by Mr. Rinderknecht.  The date of purchase

12   indicates the 25th of September and that that firearm was

13   purchased along with a second firearm by Mr. Rinderknecht on

14   the same day.

15   **Q.**   And prior to today, were you aware that there was a second

16   firearm?

17   **A.**   No, I was not.

18   **Q.**   Now, have you reviewed Government Exhibits 1 and 2, which

19   are the call logs from those incidents that you just testified

20   about?

21   **A.**   Yes, I have.

22   **Q.**   And do these -- do those two exhibits fairly capture the

23   call log notes from those incidents?

24   **A.**   Yes, they do.

25          **MS. LYONS:**  The United States would offer Government

1    Exhibit 1 and 2 into evidence.

2              MS. HAWTHORNE:  No objection, Your Honor.

3              THE COURT:  Okay.  Government's Exhibits 1 and 2 will

4    be admitted.

5         (Government's Exhibit Numbers 1 and 2 were admitted into

6    evidence.)

7              MS. LYONS:  May I have just a moment, Your Honor?

8              THE COURT:  You may.

9              MS. LYONS:  That's all the questions I have for you.

10   Thank you.

11             THE WITNESS:  Thank you.

12             THE COURT:  Cross-examination, Ms. Hawthorne?

13             MS. HAWTHORNE:  Yes.  Thank you, Your Honor.

14                         CROSS EXAMINATION

15   BY MS. HAWTHORNE:

16   Q.   Good morning --

17   A.   Good morning.

18   Q.   -- Agent Harrison.

19        I just want to ask you some questions about what you

20   testified to on direct.  So there were two incidents; is that

21   correct?

22   A.   That is correct.

23   Q.   And in those two incidents, there was never any

24   allegations of any physical violence?

25   A.   That is correct.

1    **Q.**   And Ms. Lyons just introduced Government's Exhibits 1

2    and 2.  Did you review those?

3    **A.**   Yes, I have.

4    **Q.**   Okay.  And in the narrative from September 19th, there's

5    nothing in the narrative that indicates Mr. Rinderknecht ever

6    said he would burn the house down.

7    **A.**   That is correct.  It is not in that call log.

8    **Q.**   And he -- and you went to that -- the house he was living

9    at?

10   **A.**   I'm sorry.  Can you qualify that as far as I went there at

11   what time?

12   **Q.**   You know that that house exists, where he was living?

13   **A.**   Yes, I do.

14   **Q.**   That house is not burned down?

15   **A.**   No, it is not.

16   **Q.**   Okay.  Did you ever ask his sister if she understood that

17   he meant he would burn the house down literally?

18   **A.**   No.  I was not personally involved with that interaction.

19   **Q.**   So what you testified on direct, you have very little

20   personal knowledge about?

21   **A.**   I am basing the statements today on the body camera

22   footage that I was provided as well as the call log information

23   and statements made by the agents involved directly with the

24   investigation.

25   **Q.**   Okay.  So your personal knowledge comes from a review of

1    body-worn camera footage of the -- the kind of incident

2    reports?

3    A.    Yes.  The body cam footage would have captured on video

4    and audio statements made by Mr. Rinderknecht and all parties

5    involved on those specific incidents.

6    Q.    In that body-worn camera footage, was there anyone who

7    ever asked his sister if her understanding was that

8    Mr. Rinderknecht meant literally that he would burn the house

9    down?

10   A.    No.  There was no follow-up question, to my understanding.

11   Q.    Okay.  And I know you mentioned on direct there was no

12   crime committed.

13   A.    Correct.

14   Q.    Mr. Rinderknecht was never charged with anything involving

15   that first incident?

16   A.    That is correct.

17   Q.    Okay.  Now I'd like to speak to you about the second

18   incident that occurred on September 25, 2025.  You mentioned on

19   direct that the firearm was unloaded.

20   A.    That is correct.

21   Q.    And Government Exhibit 2 reflects that the firearm was

22   unloaded as well; is that correct?

23   A.    You're indicating the call log notes?

24   Q.    Yes.

25   A.    I don't specifically recall -- I -- I don't know

1    exactly -- recall what it says, but I believe there may have

2    been an indication that the firearm was presented unloaded.

3    **Q.**    Okay.  And it's not -- it was not illegal for

4    Mr. Rinderknecht to possess one firearm?

5    **A.**    That is correct.  It was not illegal.

6    **Q.**    Also not illegal for him to possess two firearms?

7    **A.**    Correct.

8    **Q.**    And I can -- I don't know if you remember this part of the

9    narrative, but nowhere in the narrative does it mention that he

10   told anyone he would use the firearm in self-defense?

11   **A.**    That is correct.  It is not indicated in the call log.

12   **Q.**    Okay.  And you've been an officer for several years, and

13   people are allowed to use firearms in self-defense.

14   **A.**    Yes, they are.

15   **Q.**    Okay.  You also mentioned on direct that the eviction

16   process has been in the works, and that's your -- that's your

17   understanding.

18   **A.**    Yes, that is my understanding.

19   **Q.**    Mr. Rinderknecht has not been evicted?

20   **A.**    No, he has not.

21   **Q.**    Okay.  When is the last time you spoke to his family?

22   **A.**    It would have been the date of the arrest, which, again,

23   was October 7th.

24   **Q.**    Okay.  So that's a little bit less than a month after

25   these two incidents took place?

1    **A.**   Yes.

2    **Q.**   Now I'd like to talk to you about the actual arrest that

3    occurred on October 7th.  You indicated on direct that a ruse

4    phone call was used to call -- to get Mr. Rinderknecht to

5    meet -- meet with the officers.  Is that correct?

6    **A.**   That is correct.

7    **Q.**   Okay.  Did that ruse phone call involve telling him that

8    he would get some of his property back?

9    **A.**   I would prefer not to get into the specifics, but if I

10   must answer, then, yes, that was --

11   **Q.**   Okay.  And it was officers who called him?

12   **A.**   Yes.

13   **Q.**   Okay.  And he answered the phone?

14   **A.**   Yes.

15   **Q.**   And he came as he said he would?

16   **A.**   Yes.

17   **Q.**   To your knowledge, was there a search of the home that he

18   was living in?

19   **A.**   There was not a search of his home.

20          **MS. HAWTHORNE:**  Okay.  If I could please have a

21   moment.

22          **THE COURT:**  You may.

23          **MS. HAWTHORNE:**  Thank you.  At this time we would

24   move to request Jencks material.

25          **THE COURT:**  United States?

| | |
|---|---|
| 1 | **MS. LYONS:**  There is no Jencks material, Your Honor. |
| 2 | **MS. HAWTHORNE:**  Thank you.  Nothing further. |
| 3 | **THE COURT:**  Ms. Lyons, any further evidence? |
| 4 | **MS. LYONS:**  A couple of questions for redirect, |
| 5 | Your Honor, if I may. |
| 6 | **THE COURT:**  Yes.  Of course. |
| 7 | REDIRECT EXAMINATION |
| 8 | BY MS. LYONS: |
| 9 | **Q.**  Just a couple follow-ups for you. |
| 10 | Government Exhibits 1 and 2 -- those are call log notes, |
| 11 | effectively; correct? |
| 12 | **A.**  That is correct. |
| 13 | **Q.**  And they're not by any means a full report of what |
| 14 | occurred? |
| 15 | **A.**  No.  With my experience in both local municipal law |
| 16 | enforcement as well as the federal law enforcement, the call |
| 17 | log notes are simply notes indicating chronologically by date |
| 18 | and time -- entered notes by either dispatch, based on what the |
| 19 | reporting party is stating, or communication by law |
| 20 | enforcement.  Generally, at the conclusion of whatever call or |
| 21 | incident, the officer will enter additional notes in there |
| 22 | indicating what the resolution or what steps were taken. |
| 23 | **Q.**  And you have also reviewed the body camera which had more |
| 24 | information in it? |
| 25 | **A.**  That is correct. |

1    **Q.**    And the statement that the defendant made about burning

2    down the house -- that occurred after the -- or that

3    information was received by law enforcement outside of that

4    emergency phone call?

5    **A.**    Yes.

6    **Q.**    Afterwards?

7    **A.**    Correct.

8    **Q.**    Defense counsel asked you about the last time that you

9    spoke with the defendant's family being around the

10    circumstances of his arrest.

11    **A.**    That's correct.

12    **Q.**    Had their position towards him changed on October 7, 2025?

13    **A.**    In regard to --

14    **Q.**    In terms of their concerns for his stability, their lack

15    of desire to live with him.

16    **A.**    No.  Based on my personal interaction with both

17    Mr. Rinderknecht's brother-in-law and sister, they -- they were

18    concerned about his -- his safety and wanted to know a little

19    bit more about how to proceed forward with it.

20    **Q.**    And my last question is about the magazine that was

21    located.  Can you remind the Court exactly where the loaded

22    magazine was found.

23    **A.**    The loaded magazine of .380-caliber ammunition was located

24    on Mr. Rinderknecht's person, I believe, in a pants pocket.

25              **MS. LYONS:**  Thank you.

1    THE COURT:  I just have a quick question for you.

2    THE WITNESS:  Yes, sir.

3    THE COURT:  You said that the date that the firearm

4    was purchased was the 25th of September?

5    THE WITNESS:  That is correct.

6    THE COURT:  Was that the same date as the second

7    incident?

8    THE WITNESS:  That is correct.

9    THE COURT:  Does that date reflect the date that he

10    took possession of the firearm, or would that have been

11    prewaiting period?

12    THE WITNESS:  That is an excellent question.  So the

13    4473, the firearm transfer record, could be -- that date could

14    indicate a potential transfer if -- if Mr. Rinderknecht had

15    purchased the firearm previous to that date.  Let's say, by his

16    own words, previous to his move to Florida, he purchased it in

17    California, and which to legally transfer it, then it would

18    have been shipped to a Florida firearms dealer, or FFL, in

19    which case, upon them receiving it, in order for him to get

20    that firearm into his own custody, he would again have to

21    complete a 4473, go through the background check, and that

22    transfer of record would reflect that date, which, again, is

23    September 25th.

24    THE COURT:  So then, based on your experience, the

25    firearm that he had in his possession on the 25th could have

1  been that same firearm?

2          THE WITNESS:  That is correct.

3          THE COURT:  Any additional questions based on the

4  Court's questions, Ms. Lyons?

5          MS. LYONS:  No, Your Honor.  Thank you.

6          THE COURT:  Ms. Hawthorne?

7          MS. HAWTHORNE:  No, Your Honor.  Thank you.

8          THE COURT:  All right.  Thank you.

9          Anything further for this witness?

10          MS. LYONS:  No, Your Honor.

11          THE COURT:  All right.  Anything further?

12          MS. HAWTHORNE:  No.  Thank you.

13          THE COURT:  Thank you, Special Agent.  You may step

14  down.

15          THE WITNESS:  Thank you, Your Honor.

16          THE COURT:  Any additional evidence, Ms. Lyons?

17          MS. LYONS:  Your Honor, I just have some facts

18  regarding the charged offense itself, but I can proffer now or

19  along with argument.

20          THE COURT:  How about you finish proffering the

21  evidence now, and then -- well, I'll let you do it however you

22  would like.  If you'd like to make argument now, after your

23  evidence, you can do that.  If you'd like to wait until after

24  the defense presents evidence, you can do it then.  Whichever

25  you like.

1    **MS. LYONS:**  If I do the proffer and the argument at

2    the same time, can I still do that after the defense's

3    presentation?

4            **THE COURT:**  I'll give you a brief rebuttal after

5    that.

6            **MS. LYONS:**  Thank you, Your Honor.

7            **THE COURT:**  So if you want to present your evidence,

8    you can do that now, if you have additional evidence.

9            **MS. LYONS:**  So, Your Honor, I would request the Court

10   consider the facts as outlined in the complaint.  I would

11   proffer all of those details, and I will go through some of

12   those that I want to highlight right now as well as a couple

13   additional facts that are not in the complaint.

14           So the Palisades Fire, which was a continuation of

15   that fire that was started -- allegedly started by the

16   defendant, took roughly 24 days to contain.  The Palisades Fire

17   alone grew to be the tenth deadliest and the third most

18   destructive wildfire in U.S. history.  There were 12 deaths,

19   over 6,800 structures destroyed, and more than 23,000 acres

20   scorched.  It burned for weeks, triggering evacuations and

21   state and federal emergency response.  This loss of property

22   and emergency response resulted in likely billions of dollars

23   of loss and untold biological, economic, environmental impacts

24   that still remain to be seen.

25           This is, of course, not the first time that wildfires

1    have dramatically impacted communities in California.  The

2    potential for massive loss of life, property, and more is well

3    known to those who live there and across the nation.  Of course

4    this made national news.

5            Now, from 2020 to 2021, the defendant rented a room

6    at a house in the Pacific Palisades.  During that time he was

7    in a romantic relationship with an individual who lived in that

8    same house and rented the room to him, and that relationship

9    ended in late 2023 when the defendant moved out and began

10   renting an apartment in Hollywood.  In the second half of 2024,

11   the evidence demonstrate that the defendant's life spiraled

12   downward.  He struggled socially with a lack of friends,

13   financially, spent a large amount of time on ChatGPT, and

14   seemed to become deeply frustrated with both his own life and

15   society in general.

16           On December 30, 2024, he reached out to two people in

17   what appeared to be an attempt to connect, possibly to make

18   plans for New Year's Eve.  One of them told him, "No.  I need

19   space," and the other simply did not remember him.  Around that

20   same time, he had updated the location in his Uber app to

21   select rides from the Pacific Palisades area specifically.

22           On December 31, 2024, he gave rides to two

23   individuals who specifically remember him being agitated and

24   angry.

25           After that last ride, he deactivated his Uber app and

drove to the Skull Rock Trailhead.  This is confirmed by his
own statements as well as security cameras from that
residential area, which we know he's very familiar with because
he lived there.  In fact, the house where he lived was less
than two blocks away from that trailhead.

The location near where the fire was started was a
moment -- a location of significance to the defendant and his
ex.  They had spent a great deal of time there together, and
the defendant had been there, as he said, thousands of times.
He parked his car at that Skull Rock Trailhead, as video
footage confirms.  After parking he contacted his ex but did
not get a response.  And then just prior to that fire starting,
he watches that YouTube video that you read about in the
complaint that's about despair and where the individual in the
video lights things on fire.  And then the complaint goes on to
describe the investigation and how the fire spread and the
damage that it caused.

But just to highlight some of the evidence against
him, he was one of the only people anywhere near the origin of
that fire at the time that it started.  That fact is confirmed
by his own statements, cell tower data, and video footage from
the trail.  During his interview he correctly described the
location of the fire's origin, which was not public knowledge.

The investigation excluded other causes of the fire,
including the potential that he had started it accidentally

1    with a cigarette, which was determined to be highly unlikely

2    based on the weather and other factors that required forensic

3    investigation and analysis.  For starters, the defendant made

4    inconsistent statements about whether or not he smoked a

5    cigarette on the trail to even begin with.  First he said that

6    he did not.  Then he said that he did.  He failed to provide an

7    answer when asked about how he lit the cigarette, and he could

8    not respond or describe what type of cigarette it was that he

9    allegedly smoked.

10            But regardless, the extensive forensic investigation

11    excluded that as a possible cause of this fire because of the

12    weather conditions and the rapid growth of the fire being

13    inconsistent with a slow smoldering fire that might be caused

14    by a cigarette.  And when I say that extensive testing was done

15    and a lot of investigation was done in this case, just to give

16    you an example, the ATF conducted 500 laboratory trials to try

17    to evaluate the propensity of a lit cigarette to ignite the

18    surface litter that they found in the area in conditions meant

19    to mimic the conditions of January 1st.  The conditions during

20    each test were recorded, and each of the tests was documented

21    with still and video photography, including thermal imaging

22    cameras.  Four different cigarette brands were used because the

23    defendant could not -- could not or would not explain which

24    type of cigarette he may have smoked that night.

25            Of the 500 trials that were conducted, only

1    3.8 percent resulted in the lit cigarette inducing a brief

2    period of smoldering combustion on discrete coarse items

3    followed by self-extinguishment.  The smoldering combustion did

4    not promulgate through the samples and was limited to the

5    discrete fuels in direct contact with the cigarette.  None of

6    the trials led to sustained flaming combustion of any of the

7    fuels.  And this was just an example of the extensive testing

8    that was done in this case.

9              During the course of the investigation, the defendant

10    made several demonstrative lies, including lying about his

11    specific location at the time that he first saw the fire.

12              And a lighter with his DNA on it was found in the

13    glove box of the car which he admitted to bringing to the

14    trailhead.  And this was not a small BIC lighter like maybe

15    what you would use to light a cigarette.  It's like a

16    barbecue-style lighter.

17              The last fact that I would like to proffer is related

18    to some text messages that were found in the defendant's

19    communications with his ex to where he said that he was living

20    in Florida at the moment but probably not for long, that he

21    wasn't sure where he was going to go, and that he suggested

22    San Francisco, Los Angeles, Bali, or Malaysia as options.  He

23    also said that he had a job, a place, and friends waiting in

24    Bali.

25              So those are the additional facts that I wanted to

1    highlight for the Court.

2            **THE COURT:**  Thank you.

3            If you would like to make argument now, you can.

4            **MS. LYONS:**  The Government has shown by a

5    preponderance of the evidence that the defendant poses a

6    serious risk of flight or nonappearance, and the

7    Section 3142(g) factors do not support his release in this

8    case.

9            First, talking about the risk of nonappearance and

10    the 3142(g) factors that apply, starting with the nature and

11    circumstances of this offense, obviously, a very, very serious

12    offense.  As the complaint alleges, the defendant maliciously

13    started a fire that caused widespread destruction in the

14    Pacific Palisades area of Los Angeles: 12 people died;

15    6,800 structures destroyed; and thousands of acres burned.  The

16    investigation showed that many of his behaviors are consistent

17    with that of an arsonist based on the training and experience

18    of an ATF-certified fire investigator.

19            First, he followed the trucks while driving at a high

20    speed and then returned to the scene of the fire origin to

21    watch as firefighters attempted to put it out.

22            Two, he recorded the fire.

23            Three, he lied throughout his investigation with law

24    enforcement about his location at the time the fire started.

25            Four, he called 911 several times and also

1    screen-recorded himself calling 911, which investigators

2    believe is consistent with him attempting to build an alibi.

3         The defendant is charged in this complaint with a

4    violation of 18 U.S.C. Section 844(f)(1), destruction of

5    property by fire.  As the Court knows, the mandatory minimum is

6    5; the maximum is 20.  So as it is, he is facing a very

7    significant sentence.  But this complaint affidavit also

8    supports a charge under Section (f)(2) and (f)(3) of the same

9    section which include aggravated factors and enhanced

10    penalties.

11         Under Subsection (2), if during the commission of the

12    offense the individual directly or proximately caused personal

13    injury or created a substantial risk of injury, the mandatory

14    minimum becomes 7, the maximum becomes 40.  Under

15    Subsection (3), if the fire indirectly or proximately caused

16    the death of any person, the mandatory minimum becomes 20 with

17    the potential for the death penalty.

18         I say this to highlight the very serious nature of

19    this offense and the potential that the already serious

20    consequences the defendant is facing have the very real

21    potential to get worse.  And the worse consequences a person is

22    facing, the greater incentive they have not to show up to face

23    those consequences.

24         Because of the nature and seriousness of this

25    offense, the defense -- the defendant remains a danger to the

1  community.

2          Moving to his history and characteristics, these also

3  weigh in favor of detention.  I'll start by pointing out that

4  he has no criminal history, which of course weighs in his

5  favor, but when we look at everything else that is circulating

6  around this defendant, it all weighs in favor of detention.  I

7  want to start with his dishonesty.

8          First, as I've mentioned multiple times, he lied to

9  law enforcement when interviewed about the offense that

10  occurred.  He also lied to law enforcement and to pretrial

11  services about the location of the firearm.  He said it was in

12  a locked safe, which would obviously make him look more

13  responsible and less dangerous.  In reality, it was hidden in a

14  children's toy about a foot or two off the ground.  He failed

15  to mention to anyone the potential for a second firearm.

16          He also misrepresented at best his living situation

17  in his interview with pretrial services.  He told pretrial

18  services that he lived with his sister, brother-in-law, and

19  their two children.  Currently, he does not.  He failed to

20  mention that his sister and her family no longer live in that

21  house.  He failed to mention that they moved out due to his

22  erratic behavior and their fear for their safety.  He failed to

23  mention that they're in the process of attempting to evict him.

24          These kind of glaring misstatements have the

25  potential to impact the recommendation for bond or detention

1    that's made by the pretrial services officer in this case.  And

2    given this history of dishonesty, the defendant is not a

3    trustworthy individual, and this Court should not trust that he

4    would abide by any conditions set by the Court.

5              You've heard about the defendant's significant ties

6    to France, his dual citizenship, and a, quote/unquote, "lost

7    passport."  It's not possible for this Court to collect an item

8    that he says is lost, but what is lost can later be found.

9    Defendant spent his formative years growing up in France.  He

10   speaks French, and he has a brother and parents that live

11   there.  He has also specifically discussed a plan to move to

12   Bali.  So those significant ties to foreign countries are

13   concerning to the Government.

14             The defendant has no current ties to Los Angeles.

15   Although he lived there and worked there for a period of time,

16   he has no family there; and as far as the Government is aware,

17   he has no network of friends, coworkers, or otherwise in

18   Los Angeles.

19             But the notoriety of this case in and of itself gives

20   the defendant an incentive not to show up and take

21   accountability for his actions.  His actions had devastating

22   consequences on the city of Los Angeles and its people, and to

23   expect that he would willingly go back to that community and

24   face the likely severe consequences for his actions is a leap

25   of faith that this Court should not take, not to mention the

1    logistics that would be involved that I -- I do not know, as I
2    stand here making this argument now, what that plan would be.
3    Is he to pay out of pocket to drive there?  To stay in a hotel
4    throughout the duration of the proceedings?  With what money?
5    That, I do not know.  That is not a viable possibility.

6          Then you have his unstable housing situation, which
7    I've discussed a bit already.  But having your own family call
8    911 because they're concerned for their own safety twice within
9    the last month or so leading up to this hearing and this --
10   before he's even arrested on these charges.

11         On one occasion he threatens to set the house on
12   fire, which given the nature of these charges and the
13   defendant's interest in fire, I would take as a serious threat.
14   On another occasion he threatened to use the firearm that he
15   possessed in, quote/unquote, "self-defense" but in a way in
16   which self-defense was not really a likely possibility.

17         And then we have, of course, the fact that his own
18   family moved out of their house given their concern for the
19   defendant's mental health and their own safety.  He has a lack
20   of support from family and friends.  We know from ChatGPT
21   records that his relationship with his parents and his family
22   is strained.  He appears to have kind of a despondent view of
23   the world and often experiences loneliness.

24         His employment is unstable.  He has a history of
25   working for rideshare companies like Uber and Lyft.  It -- the

1    Government's understanding is that that employment has either

2    been terminated or suspended.  But, regardless, even if that

3    employment continues, working for something like Uber or Lyft

4    where you do not have a direct boss, you don't have very much

5    interaction with colleagues, there's no one with any oversight

6    over him.

7         He has unstable finances.  He is at best living

8    paycheck to paycheck.  And as I said, there's no explanation of

9    how he could afford airfare, hotel fees, or gas to get to

10   Los Angeles.

11        Then we get to the strength of the evidence of the

12   Government's case.  It's difficult to describe in a quick

13   summary for the Court the strength of the evidence in this case

14   given how complicated it is, but that's why I gave you the

15   example of the 500 tests that were done.  And we have, of

16   course, the defendant's incriminating statements, his digital

17   footprint, and him being one of the few people, likely the only

18   person, at the origin of the fire at the time it started.

19        His demonstrable lies speak to his consciousness of

20   guilt.  Innocent people do not ordinarily find it necessary to

21   lie.

22        And of course the Government has strong evidence of

23   his possible motivation for committing this heinous offense, as

24   described in the complaint.

25        Finally, the nature and seriousness of the danger to

1    any person or the community if the defendant is left at

2    liberty.  We know that he has recently acquired at least one

3    firearm.  It appears, news to the Government as of this

4    morning, that there may be two.  He's threatened to use it.

5    He's threatened violence against his own family.  He has

6    clearly some mental health issues and violent destructive

7    tendencies.  Approximately two months before the fire, the

8    defendant entered a prompt into ChatGPT where he admitted that

9    he burned the Bible and that it felt liberating.

10           We know that the night of the charged offense he was

11   agitated and angry in a way that stood out to individuals who

12   are merely riding in his vehicle.  Shortly before he started

13   this fire, he was listening to songs about despair and

14   bitterness.  And now we know that, according to the defendant's

15   own family, his behavior is getting more and more erratic over

16   the last month.  And so the Government is concerned that he is

17   in a familiar emotional and mental state as he was when he

18   committed the charged offense: isolated, financial

19   difficulties, relationship difficulties, and now added to it is

20   the very significant legal proceedings against him.

21           For these reasons the Government believes that he

22   poses a risk of flight and an unacceptable safety risk to those

23   around him and to the community at large and requests he be

24   detained pending trial.

25           **THE COURT:**  Thank you.

1          Any further evidence from the Government?

2       **MS. LYONS:**  No, Your Honor.

3       **THE COURT:**  Let's take a short recess.  We'll take

4  five minutes.

5       (Recess at 10:49 AM until 10:57 AM.)

6       **THE COURT:**  Okay.  Ms. Hawthorne, are you ready to

7  proceed?

8       **MS. HAWTHORNE:**  Yes, Your Honor.  So I can begin by

9  proffering some facts to the Court, and then I can go into our

10 argument.

11      **THE COURT:**  Works for me.

12      **MS. HAWTHORNE:**  So Mr. Rinderknecht does have a home

13 and an address he can return to if he was released, and that's

14 the address in the pretrial services report.  He has been

15 living there for the past few months.  And I did have the

16 opportunity to speak with his sister.  She is okay -- she owns

17 the home, and she's okay with him living there.  And I know you

18 heard on direct that she no longer lives there and neither does

19 her husband or their kids, but she is still okay, and the plan

20 is still for him to remain at that residence and live there

21 without them.

22         She is present in the audience today along with his

23 other sister who lives in Florida and his brother who also

24 lives here in Florida; so he does have ties to this specific

25 community.  And specifically his brother and his sisters --

1    they all live within the Middle District of Florida.  And

2    despite Government's Exhibit 1 and 2 and despite those

3    narratives and everything that Agent Harrison testified to,

4    they're here in support of him.  And they have said that they

5    will support him in any way they can, and that includes

6    financially.  So they're providing him with emotional support.

7    One of the things the -- what it seemed to me the main concern

8    that they had was for his mental health.

9            As the pretrial services report also indicates, he

10   has one brother who lives in Mexico and his parents live in

11   France.  We got the opportunity to hear on direct that his

12   father recently visited Florida.  So his parents are dual

13   citizens.  They do not -- he does not have to travel there to

14   see his parents.  They can travel here to visit him if they

15   would like.

16           With regard to employment, he has been working for

17   food delivery services, such as Uber, DoorDash, and Instacart.

18   Later I will discuss the conditions that we would propose.

19   Those conditions do not include him continuing his employment.

20           He has no criminal history and has never been

21   convicted of a crime, but I would like the Court to know that

22   he has been a victim of a crime before back in 2016 in

23   Melbourne, and so he does understand the importance of court

24   orders and following the law.

25           Our understanding is also that the firearm is out of

1    his residence.  And with regard to the second firearm, I really

2    didn't know that there was a potential that a second firearm

3    even existed before today.  But my understanding is that after

4    purchasing a firearm, you have to wait three days to actually

5    receive the firearm.  And when Mr. Rinderknecht -- by the time

6    those three days passed, he did more research, decided he

7    wanted a different firearm, and so he purchased a different one

8    and not that there was ever two firearms out there floating.

9    And so my understanding is that the firearm -- the only firearm

10   that he ever possessed is now in the custody of ATF.

11          I also just wanted to highlight one of the things

12   that's mentioned in the complaint and that the Government also

13   mentioned, and that's the music video.  That music video -- I

14   did watch it myself, and I know it mentions that there's at

15   some point during the video some burning going on.  That's not

16   at all the bulk of the video.  And, you know, as the Court is

17   probably aware, songs tend to be about despair and anguish

18   oftentimes.

19          I would also like to highlight for the Court that

20   Mr. Rinderknecht willingly gave his devices and participated in

21   interview -- in an interview with the agent.

22          He will be able to get himself to California for any

23   future court dates.  How he moved here from California, he

24   drove from California here to Florida, and that's consistent

25   with him not having his passport.  I will say in the past we

1    have been able to fill out a form online which indicates a

2    declaration of a loss of passport, and so the Court can be

3    comforted -- we can fill out that form -- and to make sure that

4    his passport has been declared lost and so he can't use or

5    obtain a new travel document without the Court being notified.

6           We do have one exhibit that we want to introduce, and

7    that's our Exhibit 1.  And that exhibit is Department of

8    Justice data between June 30, 2021, and June 30, 2022.  What it

9    indicates for the Middle District of Florida specifically is

10   that in that 12-month period, out of the 890 people that were

11   released that year, there were zero failures to appear.

12          I also took a look at the Central District of

13   California, and the data from that same time frame shows that

14   out of the 2,330 people who were released, only four failed to

15   appear, and that's a 0.17 percent failure to appear rate, which

16   is very low.  So I would ask to move that into evidence.

17          **THE COURT:**  Any objection?

18          **MS. LYONS:**  No objection.

19          **THE COURT:**  Defense Exhibit 1 will be admitted.

20        (Defendant's Exhibit Number 1 was admitted into evidence.)

21          **MS. HAWTHORNE:**  Thank you.

22          Now I'd look to go into my argument.

23          **THE COURT:**  Can you provide me a copy of your

24   exhibit.

25          **MS. HAWTHORNE:**  Yes.  Sorry about that.

1    **THE COURT:**  No.  Thank you.

2    All right.  Whenever you're ready.

3    **MS. HAWTHORNE:**  Okay.  Mr. Rinderknecht has always

4    lived in places where he either had family or friends.  Serious

5    risk of flight should be determined by who is likely to flee,

6    not just who has the ability to flee.  Mr. Rinderknecht is not

7    likely to flee.  He does not have a criminal history, and as I

8    mentioned earlier, he was the victim of an aggravated assault

9    in 2016 in Melbourne.  That person was prosecuted and

10   sentenced.  It demonstrates that Mr. Rinderknecht has an

11   understanding that the law is serious and he abides by the law

12   and will abide by court orders.

13        He has been cooperative throughout this time of the

14   investigation.  So we learned from the complaint that there was

15   an interview that took place in January.  Back in January he

16   was living in California, and so when he moved to Florida, he

17   was still -- the agents still knew where he was.  He wasn't

18   trying to hide.  He didn't try to flee, and he was still in

19   communication with them.  The complaint even mentioned that law

20   enforcement searched his car.  And, now, I don't know if they

21   had a search warrant, but if they didn't, that means he also

22   consented for them to search his car.  He has been forthcoming

23   and cooperative of -- with law enforcement, and that

24   demonstrates that he will also be cooperative with pretrial

25   services.

1      For someone who doesn't have any restrictions on

2  travel or any reason to be restricted on traveling, they do

3  travel to different states and different countries.  So it's

4  not unusual for him to have done that, and that was before he

5  had been charged with any crime.  And here we know that in the

6  past few months, since he had that interview, he was in

7  California and then came back to Florida.  I don't think

8  there's been any evidence that he traveled anywhere else during

9  this time frame where he found out he was potentially being

10  investigated.

11      I believe the Government had mentioned a text message

12  involving Bali.  And once again, he is permitted to -- he was

13  permitted to travel and live wherever he wanted.  There were no

14  restrictions on him.

15      The Government spoke a lot about the complaint and

16  the seriousness of this offense, and we do agree that this is a

17  serious offense.  But Mr. Rinderknecht is presumed innocent.

18  The way that I read the complaint is the weight of the evidence

19  is not very strong.  Everyone is nervous about speaking to the

20  police, but Mr. Rinderknecht did it anyway.  The complaint is

21  just a snapshot of the investigation, but in my review the

22  evidence seems to be circumstantial at best.

23      The complaint also seems to be contradictory to what

24  many eyewitnesses had said that they saw during the time of

25  December 31, 2024, which was New Year's Eve.

1          On page 5 the complaint discusses the song that he
2    was listening to and that he had played that song several times
3    in the previous four days.  People tend to listen to songs
4    often when they like them.  The complaint also mentions that
5    the artist was lighting things on fire.  There's one scene in
6    the music video where he lights money on fire.  The video also,
7    however, shows him drinking tea, walking in the neighborhood,
8    playing with a yo-yo.  And I say that to say that that one
9    video does not prove anything.
10          The complaint also mentions that he watched the fire
11    and firefighters and took videos, and the Government has said
12    that that seems consistent with an arsonist.  It's not just
13    arsonists who watch fires.  If your neighbor had a fire, you
14    would come out and take a video.  That's not illegal, and
15    that's not abnormal, especially in our society now where social
16    media is really prevalent.
17          The affiant of the complaint and the Government has
18    tried to highlight inconsistencies with Mr. Rinderknecht's
19    interview and his GPS location, but I think there are several
20    studies that show that geolocation data is not always accurate
21    and weather or physical obstructions can cause inaccuracies in
22    the location readings.  And we know from his attempts to call
23    911 several times, as the complaint mentions, that the cell
24    service was spotty.
25          There's a lot of circumstantial evidence that may or

1    may not really amount to anything at all, but the weight of the

2    evidence is just one consideration in the Court's factors --

3    one factor in the Court's consideration.

4            Mr. Rinderknecht's history and characteristics show a

5    man who has maintained employment, kept out of trouble, has

6    been cooperative with law enforcement, and has ties to the area

7    where we're seeking for him to be released.  He is not a risk

8    to anyone, and there is nothing violent in his history.

9            There are conditions that will reasonably assure his

10   reappearance in the court and the safety of any person in the

11   community.  Our proposed conditions will mitigate any serious

12   risk of flight or any concerns that the Court may have.  We are

13   joining in pretrial service's recommendation for their

14   conditions; however, given the concerns, we are also asking for

15   him to participate in a mental health evaluation and treatment

16   if necessary.  My understanding is that he is currently already

17   in touch with a psychiatrist that prescribes him, I think, his

18   medication, and so if there's a way that we can work out for

19   that to kind of continue or perhaps that person be the one who

20   evaluate, I think that would be great.

21           So for the reasons we mentioned, there are conditions

22   of release that will reasonably assure the safety of any person

23   and the community and his reappearance in court as ordered.

24   Thank you.

25           **THE COURT:**  Thank you.

1    Ms. Lyons, do you have any rebuttal?

2    **MS. LYONS:**  May I have just a moment?

3    **THE COURT:**  Yes.

4    **MS. LYONS:**  If I may, Your Honor.  Just a couple

5    rebuttal points, if I may.  Starting with the strength of the

6    evidence in this case, as the Court saw, this is a 24-page

7    complaint.  The strength of the evidence -- there is weighty

8    evidence against the defendant in this case, and true it may be

9    circumstantial evidence, but there is paragraph after paragraph

10   after paragraph of circumstantial evidence proving his guilt.

11   This is, of course, not his trial.  This is just a snapshot of

12   the Government's evidence, and that was why I highlighted for

13   the Court just an example of the other evidence that exists in

14   this case.

15        Related to the firearm and the second firearm, we've

16   heard now that it seems the defendant's position is that there

17   is no second firearm, but the ATF transaction record says that

18   a second firearm was transferred to the defendant.  And so the

19   information that was proffered to the Court does not comport

20   with the records that we have.  And of course that

21   investigation is still ongoing.

22        The proposed release conditions are woefully

23   inadequate.  You did not hear from a third-party custodian in

24   this case, as you might like to in a case like this.  Nobody

25   has testified to say that they support him, that they will

1  watch him, that they will make sure he shows up to court

2  appearances.  The idea of him living alone in that house where

3  clearly his family is not intending to go back to live with him

4  is -- is, as I said, woefully inadequate.

5          The defense said that he has been cooperative

6  throughout this process.  To the contrary, he has lied during

7  his interview.  He lied during his arrest about the location of

8  the firearm.  Now we have what I believe is disinformation

9  about this second firearm as well as the multiple inaccurate

10  statements that he made to pretrial services.  So that

11  description of his cooperation with law enforcement is

12  inaccurate from the Government's perspective as well.

13          Now, I will note that he was -- he was informed that

14  he was under investigation back in January of 2025.  He has

15  since left the California area to come here, and he is still

16  here.  He is still communicating with law enforcement, but he

17  did not know that he would be charged.  He didn't know the

18  severity of the crime that he would be charged with.  He did

19  not know the evidence that was developed before or after that

20  interview in January of 2025, and so his circumstances are

21  dramatically different as we sit here today.

22          The exhibit, Government -- or Defense Exhibit 1, that

23  talks about the pretrial statistics -- of course, these

24  statistics are related to cases where the judge was convinced

25  and comfortable that there were conditions that could be set

that would assure the appearance of the defendant and ensure

that there was no danger to the community.  This is not that

case.  And I would also note that in California, the Central

District, which is where he would potentially be supervised, 35

people failed to appear.

The declaration of lost passport is equally

concerning to the Government as a potential remedy in this

case.  As mentioned already in my initial argument, the

Government has -- has very significant concerns about the

reliability of the statements made by this defendant and his

ties to another country.

And so for all of the reasons that I have already

described as well as my rebuttal argument, the Government

believes that the defendant should be detained pending his

trial.

THE COURT:  Thank you.

Ms. Hawthorne, do you want to be heard one last time?

MS. HAWTHORNE:  Just briefly, Your Honor.

THE COURT:  Sure.

MS. HAWTHORNE:  It is true.  It was 35 people who

failed to appear.  I'm sorry.  I was looking at the wrong row

or column.  So the Government is correct in that.

But I do want to tell the Court that our proposed

conditions are very strict.  One of those proposed conditions

is home incarceration, and that's one of the most strict

1    conditions that a Court could impose.  And so I think that

2    our -- our conditions will mitigate any concerns the Court will

3    have.

4              And I actually think that he would be supervised here

5    in the Middle District of Florida if he's residing here.

6    That's all I have to say.  Thank you.

7              THE COURT:  Thank you.

8              Mr. Rinderknecht, let me ask you again:  How do I

9    pronounce your name appropriately?

10             THE DEFENDANT:  Sorry.  Rinderknecht.

11             THE COURT:  Rinderknecht.

12             So, Mr. Rinderknecht, as you've heard both counsel --

13             And thank you, counsel, for your argument and

14   evidence.

15             My decision today is governed by Section 3142(g), and

16   these are the factors that your counsel and counsel for the

17   Government have been arguing.  First of all, to the extent

18   necessary, I do find that the Government -- that there is a

19   serious risk of flight sufficient to justify this hearing in

20   the first place under 3142(f)(2).

21             So turning to the factors -- and just so you know,

22   the Government has to show one of two things:  Either that

23   there's no combination -- there's no condition or combination

24   of conditions that I can impose that would reasonably assure --

25   assure the safety of the community, and that has to be

1    supported by clear and convincing evidence; or that there are

2    no conditions or combination of conditions that would

3    reasonably assure your appearance for further proceedings in

4    this case, and the Government has to show that by a

5    preponderance of the evidence.

6         And there are four general factors that I have to

7    consider.  And I'm going to go out of order, but one of them is

8    the weight of the evidence.

9         In this case we've heard argument about the weight of

10   the evidence from both sides, and at this stage of the

11   proceedings, particularly where there is a complaint, it's very

12   hard for me to predict what the weight of the evidence is going

13   to be.  I think, as both counsel noted, this is a complex case.

14   It was a complex investigation.  And the findings that we have

15   in the -- or the affidavit that we have in the complaint -- it

16   has been unrebutted.  You'll have a chance later on in this

17   case to challenge all of the evidence.  So it's hard for me to

18   say at this stage of the case what the weight of the evidence

19   is, but it's certainly a complex case that's going to involve,

20   I imagine, a lot of litigation.  And so at this stage, that

21   factor to me is -- is neutral.

22        Another factor is the nature and seriousness of the

23   danger to any person or the community that would be posed by

24   your release.  I -- I'll note that I don't find that the

25   Government has proven by clear and convincing evidence that you

1    pose a risk of -- you pose a danger to the community

2    necessarily.  There is some evidence based on your mental state

3    and some threats that you've made here and there, and of course

4    the circumstances of this offense, that cause me some concern;

5    however, you have no history of -- you have no criminal

6    history.  As the defense noted, even though you were called

7    out -- police were called out twice, you were never arrested.

8    I do have some concerns about your declining mental state, but

9    I don't find that the Government has proven by clear and

10   convincing evidence that you pose a risk of harm to anybody.

11           So the real question for me today, I think, is

12   whether the Government has shown by a preponderance of the

13   evidence that there is no conditions that would reasonably

14   assure your appearance in this case, and that's what most of

15   the evidence and the argument has gone to today.

16           So turning to that, I start first with the nature and

17   circumstances of this offense.  And as the Government noted,

18   this is an extraordinarily serious offense.  Even though the

19   charge in the complaint was for a violation of Title 18 United

20   States Code Section 844(f)(1), which carries a mandatory

21   minimum sentence of 5 years, maximum of 20, the complaint

22   certainly alleges facts that, if proven, could -- could qualify

23   for a charge under (f)(3), which would have a minimum mandatory

24   sentence of 20 years and the potential for the death penalty.

25   It's very rare that we see those -- that sort of a serious

1    crime come in front of us.  So it's extraordinarily serious.

2    And I agree with Ms. Lyons when she said that the higher the

3    consequence, the higher the incentive to flee.  And I think

4    that's particularly true in this case.

5          So then the last factor that I have to consider is

6    the history and characteristics of the person, and that's you

7    in this situation: your character, physical and mental

8    condition, family ties, employment, financial resources, the

9    length of residence in the community, community ties, past

10   conduct, criminal history, et cetera.  We've already found -- I

11   think your -- you don't have any criminal history; so that

12   weighs in your favor.  You don't have -- you don't appear to

13   have a serious history of drug or alcohol abuse or anything

14   like that.

15         There are a lot of uncertainties, though, as I look

16   through the pretrial services report and the evidence that's

17   been presented in this case.  There is some uncertainty about

18   your passport.  I know you say that it's lost, but that's been

19   unconfirmed by -- by pretrial.  There's also some question as

20   to whether or not there is another firearm in the residence.

21   That causes me some concern.  Your character, I think, is -- is

22   difficult because I can only judge you based on the information

23   that's in front of me today.

24         And what I have seen in the evidence and presented in

25   this case and the argument is that you have a concerning

1    mental -- concerning decline in mental condition, it seems to

2    me, both through the actions that are alleged in the complaint

3    and then recently with your family.  I have a hard time

4    imposing a condition that would -- that would leave you alone

5    in a house.  Even if it's for a short period of time, it -- it

6    doesn't take very long to cut off an ankle monitor and flee.

7          So I'm concerned that if I were to let you out in the

8    proposed conditions from both pretrial and your counsel

9    without -- without a stable -- without stable family support --

10   and I do appreciate that your family is here and are providing

11   you support, but I have to balance that with the evidence that

12   I heard from the Government, which suggests that you've had

13   some declining relations with your family, some very recent

14   issues which caused your -- your family to move out of their

15   home and -- and leave you there on your own.

16         And what I don't want to do is release you and set

17   you up to fail, and that's part of my concern here.  Not only

18   do I have a concern that if you were released on your own in

19   this house with your declining mental state, with the issues

20   you've had with loneliness, with no employment, that does cause

21   me concern about your ability to comply with conditions that I

22   impose and to actually appear.  What you will have to do if I

23   was to release you is to drive all the way to California or

24   find your way there for every one of the proceedings in this

25   case, and there's going to be a lot of them.  And that's

1    assuming you're going to be supervised out of -- out of

2    Orlando, which I suspect would be the case.  It doesn't sound

3    like you have any ties to the Los Angeles area.

4              And along that same line, I don't see that you have

5    the financial resources.  I recognize that your family says

6    they're going to support you, but I don't have any evidence in

7    front of me of -- of your -- of their willingness to do that,

8    of what kind of financial resources they have to make that

9    happen.  I do appreciate the offer, and I credit the statement

10   of Ms. Hawthorne that they -- that they are supporting you, but

11   I have to weigh that with the evidence that you are no longer

12   currently employed, that you don't have any significant assets,

13   and that causes me concern about you actually appearing in this

14   case.

15             I think all of these things and from a lot of the

16   things that the Government proffered in this case, when I look

17   at that all together, I find that the Government has proven by

18   a preponderance of the evidence that there are no conditions or

19   combination of conditions that I can impose that would

20   reasonably assure your appearance in this case.  And so I am

21   going to order you into the custody of the U.S. Marshals to be

22   detained for further proceedings in this case.

23             Is there anything further that we can take up today

24   from the United States?

25             **MS. LYONS:**  No, Your Honor.  Thank you.

1          THE COURT:  From the defense?

2          MS. HAWTHORNE:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you, everybody.  We'll be in

4     recess.

5        (Proceedings concluded at 11:25 AM.)

1          **CERTIFICATE OF REPORTER**

2

3              I, HEATHER SUAREZ, RDR, CRR, FCRR, FPR-C, CA CSR,

4     DO HEREBY CERTIFY that the foregoing is a correct transcript of

5     the record of proceedings in the above-titled matter.

6

7              DATED this 24th day of October 2025.

8

9

10                      Heather Suarez
                    Registered Diplomate Reporter
11                   Certified Realtime Reporter
                  Federal Certified Realtime Reporter
12           Florida Professional Reporter-Certified #790
            California Certified Shorthand Reporter #14538
13

14

15

16

17

18

19

20

21

22

23

24

25